## WESTERN UNION TELEGRAPH CO. v. WILCOX et al.

### No. 10555.

Circuit Court of Appeals, Eighth Circuit.

Aug. 7, 1936.

Ralph T. Finley and Lon O. Hocker, both of St. Louis, Mo. (James C. Jones and Frank H. Sullivan, both of St. Louis, Mo., Francis R. Stark and Robert C. Barnett, both of New York City, and Jones, Hocker, Gladney & Jones and Sullivan, Reeder & Finley, all of St. Louis, Mo., on the brief), for appellant.

James L. HornBostel, of Jefferson City, Mo. (Roy McKittrick, of Jefferson City, Mo., on the brief), for appellees.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The Western Union Telegraph Company brought this suit in equity against members and the secretary of the Missouri state tax commission and the state auditor to enjoin the certification to the various counties in the state for taxation purposes of an alleged excessive and discriminatory assessment of the company's property as of June 1, 1932. Injunction was denied after trial of the issues in the District Court, and the company has appealed. Diversity of citizenship and jurisdictional amount in controversy were shown; also want of adequate remedy at law; and no question is presented here as to the form of the suit or the sufficiency of the petition.

It appears that under the laws of Missouri the state tax commission is charged with the duty of originally assessing for taxation the property of telegraph companies such as the plaintiff on the basis of its true value in money in the same proportion as other property is assessed; said assessment being subject to equalization by the state board of equalization. The telegraph company pleaded that, although the true value of its property within the state did not exceed the sum of $4,300,000, the tax commission, at first tentatively and then, after a hearing and the introduction of evidence, finally assessed its property in Missouri in the sum of $6,556,192, which assessment the state board of equalization, after hearing, refused to reduce. Plaintiff alleged further: "That in valuing the plaintiff's property and equalizing said as-

sessment, said Tax Commission and Board of Equalization, under the law and in accordance with the settled practice and custom of said Commission and Board, were required to determine the value of plaintiff's property in the State of Missouri by taking such percentage of the total value of the plaintiff's property within and without the State of Missouri as the total mileage of the plaintiff's poles and wires in the State of Missouri bore to the total mileage of the plaintiff's poles and wires within and without the State of Missouri"; that, "Within the time required by the laws of the State of Missouri, the plaintiff filed * * * a statement, duly subscribed and sworn to, * * * which statement set out the kind of property composing plaintiff's telegraph system in the State of Missouri * * * and also the number of miles of poles and miles of iron and copper wire in said State * * *"; "that from the statements filed by the plaintiff, aforesaid, and evidence offered before said Tax Commission, said Commission had before it the facts showing the total property owned by the plaintiff within and without the State of Missouri, including the total mileage of poles and wires within and without the State of Missouri, and the total cost thereof, the average cost per mile of various kinds of property, such cost less depreciation, together with earnings of the plaintiff's property prior to such assessment, as well as the market value of its outstanding stock and bonds, over a reasonable period of years prior to such assessment"; "that in making and approving the said assessment of $6,556,192.00, the said (Tax) Commission and Board of Equalization deliberately, intentionally and arbitrarily grossly overassessed the plaintiff's said property to the extent that the said assessed value was fixed in excess of $4,300,000.00, by deliberately, intentionally and arbitrarily basing said assessed value upon a cost basis alone, in total disregard of the earning power of plaintiff's said property and the true value in money of its said property; that the valuation of plaintiff's said property fixed by said Commission and approved by said Board of Equalization is not supported in any manner by any representative method or basis of valuation; that to arrive at any value of said property in excess of $4,300,000.00, said State Tax Commission could only have grossly overassessed the plaintiff's property in Missouri or considered valuations of plaintiff's property outside of the State of Missouri, not

legally forming a part of plaintiff's property within said State; that in so valuing the plaintiff's property, and in basing its valuation upon cost alone, and disregarding the earning power and the market value or true value in money of plaintiff's said property, the said Commission and Board of Equalization proceeded upon a fundamentally wrong theory of valuation, for all of which said reasons the amount of such valuation in excess of $4,300,000.00 constitutes a fraud against this plaintiff, and deprives and will deprive the plaintiff of its property without due process of law," "and denies to the plaintiff the equal protection of the laws."

The plaintiff further alleged "that while intentionally, deliberately and arbitrarily assessing the plaintiff's property, as aforesaid, as of June 1, 1932, for the taxes for the year 1933, grossly in excess of its true value, as aforesaid, and upon such fundamentally erroneous basis of valuation, the said State Tax Commission and State Board of Equalization deliberately, intentionally and arbitrarily fixed, approved and equalized the assessment of all other property in the State of Missouri, for the same year, in the same class for the purpose of taxation, at not to exceed eighty per cent. of its true value in money; that such action by said taxing authorities was and is a discrimination against, and a fraud upon, the plaintiff * * *" And more particularly it was alleged that real estate and personal property were underassessed at 65 per cent. of true value and that flat reductions were made in the assessment of real and personal property, especially upon flat rates of value for livestock on account of the financial depression since 1929, and that all such underassessment has been so open and notorious that the same has developed into a well-established practice and custom of underassessment.

These claims were put in issue by the answer of the defendants, and on the trial of the case a member of the state tax commission, Mr. A. J. Murphy, who had participated in making the assessment complained of, testified as a witness for the defendants, and narrated in detail how the assessment was arrived at and made by the board. The contentions argued in this court can be more readily introduced by a consideration of Mr. Murphy's account of the making of the assessment.

Mr. Murphy said that the sworn return of their properties to the tax commission was supposed to be filed by the public utilities before the end of the year (in this case 1932), and the board passes on it in the spring of the following year or sometime in the summer. In its return for the tax year in question the company omitted to report certain properties amounting to around $800,000 which it had always included in the reports in previous years, and it also claimed greatly reduced values, so that upon the face of its return its assessment would be much less than it had been. Accordingly, a study was made by Mr. Murphy, not only of the returns made by the company to the tax authorities in Missouri, but of its reports to the Interstate Commerce Commission, the Missouri Public Service Commission, and to stockholders. Mr. Murphy prepared tables showing what the assessments of the Western Union property had been in the state of Missouri over a number of years. The assessments from 1921 to 1931 were as follows:

| 1921 | $5,470,540.00 |
| 1922 | 5,724,447.00 |
| 1923 | 5,499,156.00 |
| 1924 | 5,865,121.00 |
| 1925 | 5,851,999.00 |
| 1926 | 5,840,633.00 |
| 1927 | 5,853,930.00 |
| 1928 | 5,918,248.00 |
| 1929 | 5,893,139.00 |
| 1930 | 5,955,751.00 |
| 1931 | 5,955,653.00 |

It appeared that in a period between 1926 and 1931 the property of the company, as assessed in Missouri, had only been increased $115,000, whereas the reports of the company filed with the Public Service Commission of Missouri showed that in the five-year period from 1928 to 1932 the increase of the company's book value of plant and equipment was $69,161,168. There was nothing in the reports made by the company to the taxing authorities of Missouri from year to year showing increased valuations except that some increase of mileage of wires and poles was indicated. Examination of the returns made by the telegraph company to the taxing authorities in Missouri disclosed that the company did not report the number of miles of wire owned or operated by it in the state of Missouri or in the United States, so that, although Mr. Murphy deemed the pole and wire mileage comparison proper for state allocation purposes, no such allocation could be made from the returns made to the Missouri taxing authorities. Mr. Murphy said: "We

were trying to arrive at a correct value of the properties using * * * whatever information we could get. * * * We had copies of their annual reports to the stockholders and in reading these reports we discovered that in this ten years in which we had not been increasing their assessment in Missouri they say their property has increased 83 per cent. They did not say what kind of property but we had information enough to know it was similar property to that in Missouri, poles and wires and telegraphic instruments." The company's reports showed that "the new construction for the six years (1928-1932) * * * added to plant and equipment were: Poles $20,802,109.00; wires, $13,-548,031.00; aerial cable, $2,751,825.00; underground cable, $4,486,269.00; conduit $3,948,976.00; pneumatic tubes $1,677,804.-00; telegraphic equipment, $21,340,090.00; total additions to assets $113,232,321.00." "We were trying to make up our minds whether this property (the telegraph company's) should be worth more, * * * we examined their annual report and find that the company's annual report for the fiscal year 1931 says 'the company's property has been expanded and intensively developed to keep pace with the growing demand for better and faster telegraph service. Additions and betterments to the plant during the twenty years ending 1931 aggregated $193,335,000.00.'" It also appeared in the reports to stockholders for 1931 that the taxes of the company throughout the United States generally were double those of ten years ago, whereas the property account had increased only 83 per cent.

With this and other information in hand, Mr. Murphy prepared tables of computations of the company's property values and pole and wire mileages to arrive at a valuation for the assessment. He testified that in reaching the valuation upon which the assessment was made the commission did not adopt the reproduction cost new less depreciation basis nor any other one theory. In response to the question propounded by the court to Mr. Murphy: "How did you arrive at your assessment?" Mr. Murphy said: "We arrived at that originally by the first method that I talked to you about, the reproduction cost new, comparing that with the earning statement at that time as we knew it and the sale of their securities as we knew it at that time. That was a fair average of the three methods there. The average on plans 1, 4, and 5, that is the reproduction cost new, total net income and

sale of securities, which we think are the fair methods. The average of those three is $6,897,350.00." (The assessment being $6,556,192.)

Although Mr. Murphy did not testify that he was an accountant, his testimony reflects that he was competent to and did make comprehensive studies of the company's properties from the sources referred to by him.

On the trial Mr. Murphy submitted tables which contained the figures in detail to reflect computations made according to each method employed to arrive at the value of the company's property in Missouri. The tables so presented on the trial were not those originally compiled by the commission prior to the assessment. Mr. Murphy says: "We made tables in the light of more recent information which we" are submitting. "After this suit came up we had to make further investigation, that is the company did. The company revised their estimates. Every time they revised their figures we would have to revise ours; we would get some additional information." The tables of computations, submitted by Mr. Murphy and received in evidence, show the valuation of the plaintiff's property of June 1, 1932, by five different methods, summarized as follows:

| | |
|---|---|
| (1) Reproduction Cost New Less 15% depreciation Plus 8% Going Value $7,-997,761—$1,999,664 equals $6,792,007 plus $543,360 equals | $7,335,367 |
| (2) Prorated Book or Cost Value $9,930,871 —15% Dep. $1,489,620 equals $8,441,-241 plus 8% equals | 9,116,540 |
| (3) Plant Capitalizing Earnings over a 5-year term at 6% return equals | 5,917,607 |
| (4) Capitalizing Total Net Income at 7% 1928–1929–1930 and 6% 1931–1932 | 6,473,571 |
| (5) Sale of Securities equals | 6,883,113 |
| Average of all 5 valuations | $7,145,239 |
| Assessment | 6,555,690 |
| Average of 1-4-5 | 6,897,350 |
| Valuation on Cost of property less Depreciation plus going value which is valuation used in the assessment of land, Town lots, and most property } Equals | 9,116,540 |
| Assessment | $6,555,690 |
| 72% | |

Voluminous testimony offered for the company was to the effect that the computations as made for the Board upon each of the several identified methods of estimating values were erroneous, that the conclusions arrived at were wrong, and that the true

value of the company's property in Missouri was only a fraction of the assessment.

On the issue of discrimination Mr. Murphy testified that the practice of the tax commission was to "make a map showing each county in the state and we put down in red ink on this map (over each county) the last previous assessment confirmed by the State Board of Equalization which, in this case is 1932, which was the assessment for 1931. Then we put a second figure in black ink, the average assessment per acre of farm land returned from each county. * * * After this map has been completed and other assessments arrived at by the County Assessor and certified to by the Tax Commission, the Tax Commission reviews these assessments, compares the assessments with the previous year and gets these maps for probably two or three years back and sees what the general tendency in each county has been, whether it is up or down. We compare the assessment in each county (with the assessment) on lands of the surrounding counties and if we find a discrepancy or if our other information leads us to believe that any of the figures returned by the assessors are too high or too low, we increase it or decrease it and make this third set of figures which is the valuation arrived at by the Tax Commission. Then, we certify these up to the State Board of Equalization who make an additional finding and their finding is the fourth figure on these maps which is the final assessment for the state." In answer to the question: "Mr. Murphy, I will ask if the Tax Commission intentionally assessed the property of the plaintiff at more than its true value and other property in the state at less than 100% of its true value in money?" Mr. Murphy answered: "No."

The plaintiff called some fifty-odd witnesses who gave testimony tending to show that real and personal property in the state was assessed below its true value and that there had been flat reductions in the assessments upon certain classes of personal property, notably, livestock and bank stock. Many witnesses called for the defendants gave testimony tending to show that property values in Missouri had gone down much faster than taxing officers had reduced assessments, so that in the tax year in question assessed values tended to approximate closely to real values in money.

Neither of the parties made any request to the court to find specially upon any of the very numerous fact disputes developed in the large volume of testimony, and the court accordingly declared briefly and generally that it could not be found as a fact that the fair value of the plaintiff's property as of June 1, 1932, was less than the amount at which it was assessed; nor that there was any intentional, deliberate, or arbitrary overassessment of plaintiff's property; nor that the assessment of other property in Missouri "was not at the true value in money of that property"; and the court found "that there was no intentional deliberate nor arbitrary discrimination against the plaintiff by assessing its property at a different or higher percentage of its true value in money than the percentage of value at which other property in Missouri was assessed in 1932." The court, accordingly, dismissed the bill.

On this appeal the contentions of the appellant relate, first, to its claim that its property was overassessed, and, second, to the claim of discrimination on account of the alleged failure to equalize the plaintiff's assessment on the same basis of valuation as the great mass of other property in the state.

### Overassessment.

As to the overassessment of the property, it has been argued for appellant that the assessment here assailed was not arrived at by the tax commission upon consideration of computations made in accordance with the several theories of valuation testified to by Mr. Murphy, but that it was, in fact, made arbitrarily by wrongfully including certain locally assessable properties and other property outside the state at grossly excessive prices and then resorting to computations merely to check or justify what had been wrongfully done. It is claimed that a so-called "work sheet" produced from the files of the commission (Exhibit 17-A) and the testimony concerning the same would so indicate. The exhibit referred to includes an item "Other Equipment, $1,498,764," and it is argued that the property referred to in this item was in part property that was outside of the state and that another part, amounting to at least $1,000,000, was inside of the state but locally assessable and not subject to assessment by the tax commission. On study of the testimony relative to this controversy, we have concluded that it was not established that the identified work sheet was intended to or did set forth the elements upon which the assessment was based by the tax commission. We have concluded that we

358

should give credence to Mr. Murphy's statement that the assessment was reached originally by the commission upon consideration of the several methods of computation and the combination thereof as described by him.

The appellant has also presented that the commission followed fundamentally erroneous methods to compute the value of plaintiff's property as argued in the following contentions, which we will number, epitomize, and discuss:

1. That in its valuation upon the reproduction cost new basis the commission wrongfully included an arbitrary item of 8 per cent. for franchise or going value, amounting to $300,000.

2. That the commission included personal property to the extent of at least $1,000,000, which was assessable by the assessors in the local subdivisions of the state and not by the state tax commission.

3. That the commission based its valuation upon book values without adequate allowance for depreciation and without due consideration of actual values, wrongfully taking (in part at least) an average value over a period of years.

4. That in its valuation by capitalization of earnings, (a) a five-year average was wrongfully taken; (b) expenses of rent on lease lines were not deducted; (c) the commission capitalized earnings on the basis of 6 per cent. instead of 7 or 8 per cent.

5. In its valuation on the sale of securities basis of computation the commission (a) wrongfully used a five-year average of sales values; (b) it wrongfully added stocks and bonds which plaintiff had purchased amounting to about $1,765,550; noninterest-bearing liabilities, about $13,000,000; premiums on stocks, about $1,163,350; and bonds owned by plaintiff and deposited as collateral for loans, $3,143,000.

■ 1. *Going Value.* In estimating the value of the company's property upon the basis of reproduction cost new less depreciation, the Board, after deducting 15 per cent. depreciation from the gross valuation, added to the depreciated figure an amount equal to 8 per cent. thereof as going value. Later, when the tables showing the five different methods of estimating values had been compiled, the same addition of 8 per cent. upon the depreciated valuation was made by Mr. Murphy in reaching his valuation by his so-called prorated book or cost value. Mr. Murphy said: "In some of these computations there is an 8 per cent. going value as a part of the real value of the property. It was added, however, after taking off depreciation." "The theory of going value is this: that in a property of this kind, spread out over the United States, that it would take at least five years to build, that you would incur three or four years taxes, interest, and everything on your securities before you get to earning a cent. You are attempting to establish the value of it at the present time. * * * So I think that is a proper element to be taxed. We assess similar values on every utility in the state. * * * Always have."

The reasons upon which it has been found necessary in estimating the value of properties like the plaintiff's to make an addition on account of going value have been explained and upheld by the courts in numerous cases (see Los Angeles Gas & Electric Corp. v. Railroad Comm., 289 U.S. 287, 313-319, 53 S.Ct. 637, 77 L.Ed. 1180); and we do not find fundamental error, illegality, or fraud in the addition made under the item "Going Value." Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 139, 56 S.Ct. 426, 80 L.Ed. 532; Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 109-111, 55 S.Ct. 55, 79 L.Ed. 222; Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 28, 52 S.Ct. 48, 76 L.Ed. 146; Iowa-Des Moines Nat. Bank v. Bennett, 284 U.S. 239, 245, 52 S.Ct. 133, 76 L.Ed. 265; Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340, 28 A.L.R. 979.

■ 2. *Property Claimed to be Locally Assessable.* Two assignments of error and considerable portions of appellant's brief and reply brief relate to its second contention above stated to the effect that certain property included by the Commission was locally assessable property. There is no competent evidence to establish that the property referred to in this contention ever was actually assessed by local assessors in the state or that there was a double assessment thereof by local and state assessing officers. Mr. Meigs, testifying for the telegraph company, says that "he had been told that the elements of value enumerated" had been locally assessed and that "he had been told that the reason for not including them in the returns of the company for the year

in controversy was that he had been so told by Mr. Whitney, now deceased, who was tax attorney." Whether any of the company's property was in fact being doubly assessed, once by local assessors in the counties and again by the state tax commission, was a matter very easy of ascertainment and demonstration by the company. The Missouri statute (section 9764, R.S.Mo.1929 [Mo.St.Ann. § 9764, p. 7880]) requires the company to make a sworn return to local assessors of any of its property which is locally assessable, and no such local returns are shown. Mr. Murphy testified: "I want to say further that there is a blank sent to them (the telegraph company) to make a return of their property in each county in the state and each taxing subdivision. They reported nothing on those blanks, except the number of miles of wire and number of miles of poles. They did not give us a list of any other property in those counties or taxing subdivisions."

Neither did the company plead that the tax commission had committed the wrong now complained of. Its pleading was, as stated, that the tax commission had arrived at its excessive assessment by other means specifically set out, not including double assessment by local officers and by state officers. The pleading referred to is the amended petition which the plaintiff was permitted to file after all of the testimony had been taken on the trial. Nor does the record disclose that this contention now seriously urged upon us was presented to the trial court. Undoubtedly the great bulk of locally assessable property belonging to the telegraph company in Missouri is in St. Louis, where it has valuable land and buildings and equipment. Mr. Murphy was very positive that those were not included in his calculations. He testified: "In making these computations I did not count in the buildings and land. * * * I eliminated those * * * they were deducted as non-distributable property. What we recognize as and what the law recognizes as nondistributable property is lands, buildings. * * * We did not include these in this calculation." He said that he had only included "distributable property" in his calculations and that such property was properly assessable by the state tax commission rather than by the local assessors.

Because it has been urged upon us with earnestness we have given this contention of the appellant careful consideration, but we conclude that it should not be sustained.

3. *Book Values—Depreciation*. The appellant pleaded and has contended upon elaborate analyses of all relevant computations and figures that the commission gave undue weight to book values. Its argument establishes that in the depression tax year in question book values were not an accurate criterion of true value, and undoubtedly, if it could be proven that the assessment was merely the book value in that year, that would present "a fundamentally wrong theory" of valuation.

At the opening of the trial counsel for the telegraph company said: "There is no dispute about the reconstruction costs new in any value of the physical plant. There is no contest but that that is correct." There were disputes as to what items should be properly included. The company submitted four different reports of its reproduction cost new as of June, 1932. Report No. 1 was submitted in 1932 and withdrawn because of errors. Report No. 2 was submitted in January, 1933. Report No. 3 was submitted in depositions taken by appellant in New York after institution of this suit. Report No. 4 was submitted when the case was being tried before the court. The totals of the reports are as follows:

| | Reproduction Cost New | Reproduction Cost New Less Depreciation |
|---|---|---|
| Report No.2 (Pl.Ex.19) | $8,741,589 | $6,163,109 |
| Report No.3 (Pl.Ex. 3) | 7,656,296 | 5,324,029 |
| Report No.4,(Pl.Ex. 6) | 9,316,074 | 6,775,728. |

(The assessment, $6,556,192, is exactly 75 per cent. of the above figure $8,741,589.)

In all of its reports the company took a 30½ per cent. depreciation and omitted going value. Reports Nos. 2 and 3 omitted items of property aggregating $885,808 claimed to be nonassessable by the company but which were included in report No. 4, and which the defendants claim should be included. They all also omit additional items amounting to $317,935 of property which had been reported as operative property of the company to the state authorities in previous years and which ought to be included according to the defendants. The estimate of reproduction new less depreciation at 15 per cent., with 8 per cent. going value, arrived at and shown on defendants' table of computation, was $7,335,367. Recalculation of the defendants' three methods of computation, 1, 4, and 5, produces the following result when weighted by attributing

20 per cent. to the first method and 40 per cent. to each of the others, as follows:

| | | |
|---|---|---|
| Value by Reproduction Cost new less depreciation. | | |
| Method No. 1 | $7,335,367 | |
| 20% of this value | | $1,467,073 |
| Value by Capitalization of Net Income | | |
| Method No. 4 | 6,473,571 | |
| 40% of this value | | 2,589,428 |
| Value by Sale of Securities | | |
| Method No. 5 | 6,883,113 | |
| 40% of this value | | 2,753,245 |
| Value by Combination of Methods | | $6,809,746 |
| Appellees' Assessment | | 6,555,690 |

Upon consideration of these tables and the data from which they were derived, we think it cannot be held that the assessment in question was wrongfully rested on book values or on reproduction cost new less depreciation plus going value. The strength as well as the weaknesses of the reproduction cost new less depreciation method of valuation have been recognized and explained by the courts. Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041; Harris Trust & Sav. Bank v. Earl (C.C.A.8) 26 F.(2d) 617, 618; Chicago & N. W. Ry. Co. v. Eveland (C.C.A.8) 13 F.(2d) 442; Northern Pac. Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163, 174, 175, 190, 191; See Standard Oil Co. v. So. Pac. Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890. But it is an allowable method of estimating values, providing undue weight is not accorded to it. In the computations above set forth, a weight of only 20 per cent. has been accorded, and the resultant figures do not show a grossly excessive or arbitrary assessment was arrived at.

■ Neither do we sustain the contention of the appellant that the only allowable depreciation was 30½ per cent. It would appear that, in view of the reports made by the company concerning the condition of the property, a less percentage could lawfully be taken for depreciation. Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182. We have not overlooked the testimony of Mr. John B. Campbell, called as a witness on rebuttal for the telegraph company, who testified, among other things, that, as a stockholder in the company, he had received no dividends for several years and that the company's properties in Missouri were depreciated on the average of about 50 per cent.

Other testimony reflects that dividends have been earned on the stock of the company continuously since 1870, and that the lesser rate of depreciation was not improper.

■ *4. Capitalization of Earnings.* Mr. Murphy prepared several tables reflecting an estimate of the value of the company's property in Missouri according to the capitalization of earnings method, always taking averages over a five-year period, and appellant complains that it was fundamentally erroneous to use a five-year period in computing under this method. The evidence is that the earnings of the company were at the lowest point in the tax year in question, and it is argued that, as the only value in the company is its power to earn, when its earnings fell its value for taxing purposes should be reduced to the same low level. We think it was necessary for the commission to consider the reduced earnings, but we do not agree that, because the net earnings fell to little more than a third of what they were in 1928, the assessment should be reduced to the same extent. The long-maintained stability of the company cannot be disregarded, and it was not fundamentally erroneous to consider the five-year average in the computation. Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 149, 56 S.Ct. 426, 80 L.Ed. 532; Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 105, 55 S.Ct. 55, 79 L.Ed. 222.

■ In making the computation in one of the tables presented by him, Mr. Murphy capitalized net income of the system at the rate of 7 per cent. per annum for the three years 1928, 1929, and 1930, estimating the values at $319,190,540 for 1928, $330,542,858 for 1929, and $282,528,985 for 1930, but for the two years 1931 and 1932 the valuation on this basis fell to $242,418,566 and $126,566,800 respectively upon a 6 per cent. capitalization used for those years. The appellant complains that there was fundamental error (among other things) because in making the computations the item of "expenses on rent of leased lines" was not deducted. The experts for the company claimed large deductions by reason of the rent items.

On this issue Mr. Murphy testified that the reports of the company reflected that the company leased about 15 per cent. of the total wire which it used in the system and that it paid large sums for rent on the leased lines—about three and a half million dollars in the year 1928, for instance. It appears that the company had very little

leased plant or equipment in Missouri, and Mr. Murphy testified that this fact had to be taken into consideration in making the computation of value upon the capitalization of earnings method used to make up the table on that basis. He pointed out that, unless the item of rent from leased property was treated the way he treated it, an unfair reduction of the value to be allocated to Missouri would result. He testified: "They pay three and one-half million dollars rent on that 15 per cent. of their wire," and he said: "We take it (the item of rent) off after we determine the earnings of the entire wire mileage. Then you pay it, but it is not a proper deduction before you determine the earnings of your entire system."

The real inquiry of the commission was as to the result of capitalizing the earnings per mile in order to attribute just value to the miles in Missouri. In Mr. Murphy's view, Missouri was not concerned that some of the company's wires in other states were leased and rental paid therefor. As the ultimate allocation to Missouri from all of the computations according to this method was upon the comparison of wire mileages, we are not convinced that the method of computation described and illustrated by Mr. Murphy was fundamentally erroneous in the particular complained of.

██ Neither can it be said that the 6 per cent. basis used for capitalization of earnings was fundamentally erroneous. Great Northern Ry. Co. v. Weeks, supra.

██ *5. Sale of Securities Method.* In estimating the system value of the telegraph company on the sale of securities basis, Mr. Murphy testified that the figures were all obtained from the company's reports to the Public Service Commission as to quantities of securities, and the sale prices were obtained from letters of the company and from information furnished by the company to the Oklahoma state tax commission. "The prices on the securities which they report agree with our records but there are a number of securities they did not report that we had to get prices on elsewhere."

The appellants complain that the securities which Mr. Murphy here refers to and which the company did not report ought not to have been included in the computation of value according to the sale of securities method.

It appears that the company carries on its books certain large items as liabilities which are peculiar. One item is carried in its reports at about $13,000,000, another item is "premiums on stocks" about $1,-163,350; "bonds owned by plaintiff and deposited as collateral for loans," $3,143,000; and "stocks and bonds purchased by plaintiff" amounting to about $1,765,550. The nature of the items was explained by Mr. Dow, testifying for the company. The question whether the items should have been included in Mr. Murphy's computations of value on the "Sale of Securities" basis is not free from doubt. Mr. Murphy's testimony reflects that he understood the peculiar nature of the items and gave them careful consideration. He says that "item of $13,000,000 is the one that is explained here * * * 'Deferred non-interest bearing liabilities in respect of proceeds of sales of securities and other properties held under leases for terms expiring in 1981 and 2010 from companies in which the Western Union Telegraph Company has, for the most part, a controlling interest, payable on the termination of the leases.' I don't know what would be the present value of that liability but I presume the proceeds of those have been turned into money and invested in the plant." (Not denied by Mr. Dow.) He says, as to the item of $3,143,000, "That represents bonds presumably of their own company that is owned by the company and deposited as collateral security for loans." He says that the company put the items on its balance sheet as liabilities. "You (the company) promise to pay those securities. They are on your liability side; they are a debt of the company. Anybody going to buy your stock would look and see that you owed $18,000,000.00 before they could get their money." They (the items) "reduce the value of the stock just that much."

Upon these considerations Mr. Murphy left the items in his computation and maintained on the trial that they should be left in. We think that their inclusion tended to somewhat exaggerate the total value reached on the "Sale of Securities" basis. On the other hand, there could be no justification to omit these items entirely from the computation of value on the sale of securities basis. They appear to have been an integral part of the financial setup reflected by the company's report, and the theory of this particular method of computation contemplates that all obligations ahead of the capital stock liability must be included in the computation. Accountants' ingenuity should suggest some adjustment in relation

to the items, but such error as is involved in Mr. Murphy's computation is not the fundamental error of method denounced by the courts, but merely a failure to reach perfection in the details of carrying out of a method of computation which method was in itself fundamentally sound; that is to say, the method was one of the methods permissible to be used where no undue weight is accorded to it, and no undue weight was accorded in this instance.

■ *Allocation Percentages.* It appears that different percentages were used by Mr. Murphy in different computations to allocate Missouri's share of system values ranging between two and a fraction to three and a fraction per cent., and Mr. Murphy explained the method of arriving at each of the percentages. Mr. Murphy does not dispute the propriety of comparing the total mileage of "plaintiff's poles and wires in the state" with "the total mileage of the plaintiff's poles and wires within and without the state," alleged in plaintiff's petition to be customary and proper. But it appears that plaintiff had not reported the specific number of miles of wire owned and miles operated by the company in Missouri or in the system. Consequently, it was necessary for Mr. Murphy to make elaborate computations as to pole lines, conduits, cables aerial and underground cables, cables, pneumatic tubes, etc., and Mr. Murphy's testimony is persuasive that the computations he made were in good faith to arrive at a proper percentage for allocation in each instance, and none of the percentages so used by him has been shown to be fundamentally erroneous or arbitrary.

■ Although in our discussion of the valuation of appellant's property we have referred extensively to the testimony of Mr. Murphy, we have not overlooked the opposing testimony of the company's witnesses. But our inquiry has been whether the valuation was arbitrarily arrived at, or by fundamentally erroneous methods, or by such reckless disregard of proper evidence as to amount to fraud and, as Mr. Murphy was a member of the assessing body and participated in and knew its processes, frequent reference to his testimony and explanations has been necessary.

Appellant has contended that the conclusion reached by the Supreme Court in Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 433, 80 L.Ed. 532, is the conclusion required by the testimony here. In that case "the testimony and computations made by respondents' [the taxing officers] witness show that the 1933 assessment could not have been arrived at by any calculation based on the principles and methods governing the tax commissioner in his computations submitted to the board through a period of years and constituting the controlling bases of the assessments made by it," and the Board arbitrarily adopted an assessment clearly demonstrated to have been inapplicable at the time of the assessment. 297 U.S. 135, loc.cit. 148, 149, 56 S.Ct. 426, 80 L.Ed. 532.

We are satisfied that no such situation is here presented, and the case is relevant only as it reiterates the positive duty of the courts to afford protection in every proper case against unlawful confiscation attempted under the guise of taxation. St. Joseph Stock Yards Co. v. U. S., 56 S.Ct. 720, 80 L.Ed. 1033; Baltimore & O. R. Co. v. United States, 56 S.Ct. 797, 80 L.Ed. 1209. The elaborate and painstaking analysis of the whole testimony presented in the brief and reply brief of the appellant leaves no doubt that some computations and estimates of value given by Mr. Murphy involved inaccuracies, but we find no mistakes which reflect any intention or purpose of the commission to depart from or disregard methods which are recognized to be sound and applicable. We deem the opinion in Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222, more nearly controlling here and that the charges of fraud or arbitrary, willful, or fundamentally erroneous action in the valuation put on the plaintiff's property were not sustained.

### Discrimination.

■ The property of appellant is of the kind of property referred to as utility property, and it is not shown in the testimony that utility properties in Missouri were assessed for the tax year in question here below their full 100 per cent. value, nor that there was discrimination between the assessment of plaintiff's property and that of utilities generally in the state. Cf. Iowa-Des Moines Nat. Bank v. Bennett, 284 U. S. 239, 52 S.Ct. 133, 76 L.Ed. 265; Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146; Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 43 S.Ct. 190, 67 L.Ed. 340, 28 A.L. R. 979.

Although very substantial reductions were made in the assessment of the stocks of banks in the state, the testimony discloses very pressing reasons for such re-

ductions and why they were made. There was a general shrinkage of value of loans, bonds, and other investments which, on the whole and generally, affected the value of bank stocks and occasioned a reduction in their assessments. Mr. Sam E. Trimble, a member of the tax commission of the Missouri Bankers Association, testified:

"I am executive vice president of the Union National Bank. * * *

"Considering the experience of so many of the banks closing, the liquidation of these banks, the fluctuation downward of securities which heretofore had always been regarded as good and marketable, even the fluctuation of Government securities, the downward trend of real estate, we made a calculation after going thoroughly into it that a deduction of approximately 4 per cent. on the resources of the average bank in Missouri would equal a reduction of 40 per cent. of the capital structure. To illustrate, the ratio in Missouri is about ten to one; the total resources is about ten times the capital structure. Four or five per cent. of that would equal 40 per cent. of the capital structure. The banks were trying to build up reserves in surplus and undivided profits for protection and that was also considered because that was a safeguard for the depositors and that was by experience and observation that we came to that conclusion. It was our conclusion that the 60 per cent. assessment was the real value of the shares of the bank."

Likewise as to livestock, there was a great falling off in value and assessments were somewhat lowered.

There is a large volume of testimony taken by the plaintiff including individual and compiled tables of appraisals in many parts of the state and comparisons with assessments and admissions made by assessors of intentional assessment below full value and studies of values and assessments such as have become familiar in cases of this character since Louisville & N. Ry. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291, Ann.Cas.1917E, 97, all of which has been read and considered.

It appears that the grand totals of the taxable wealth of the state of Missouri for the years 1929, 1930, 1931, and 1932 were as follows:

| | |
|---|---|
| June 1, 1929 | $4,968,850,691.00 |
| June 1, 1930 | 4,788,153,970.00 |
| June 1, 1931 | 4,320,685,447.00 |
| June 1, 1932 | 3,909,115,389.00 |

From which table it appears that there was a reduction in the assessment of all property of about 20 per cent. over the period. There is persuasive testimony that actual market values and true values in money of property of almost all kinds and descriptions in Missouri fell much more than the 20 per cent. shrinkage in the total assessments, and it is made especially clear that as to great masses of property actual buying and selling fell off to such an extent that there appeared to be no firm or constant market for sales. It is also evident throughout all the testimony that the absolute necessity of the state and localities to raise money enough to run the government prevented the lowering of assessments entirely without check. Mr. Forrest Smith, a defendant member of the state tax commission, testified:

"As a member of the State Tax Commission my chief duty was dealing with taxation, the matter of assessments and valuations of property, exercising some superintendence and control over the assessment valuations of property all over the state. We had a meeting with the assessors every year before they started assessing as of June 1st. I tried to familiarize myself with the values of real and personal property in Missouri in the year 1932. At that time there were practically no sales except foreclosures, very few bona fide sales in the state. Due to the economic condition, of course, no one wanted real estate. There is no income from it and banks wouldn't loan money on it. The prices of live stock and grain at that time were very low, below the normal on live stock and wheat was about the lowest. At threshing time the Missouri wheat sold for 22 to 35 cents a bushel; corn was about 35 cents a bushel June 1, 1932. * * * I would say it was assessed at 100 per cent, of its actual value. * * *

"My information as to value was not gathered entirely from delegations who wanted their taxes lowered. We sent out questionnaires to the various assessing officers and we used every means we knew to obtain accurate information. We took the questionnaires wherein the assessors state the percentage in their county as evidence of what they were being assessed; the same with the county courts; and considered that along with the delegations who came on complaints. Under the law, of course, we were compelled to visit every county in the state every two years for the purpose

of studying conditions and familiarizing ourselves with property values."

The trial court, in a memorandum commentary on certain of his findings, said: "I am frank to say that upon a first consideration of the evidence I was inclined to the view that the plaintiff had proved an undervaluation for taxing purposes of all other property in the state. Further consideration of that matter, however, has convinced me that while prior to the year 1932 there had been such an undervaluation of other property in Missouri, the sharp decline in all property values in the state resulting from the depression, a decline that had become fully manifest in 1932 substantially had made, what doubtless was intended to be an undervaluation a fair approximation of real values. There was evidence supporting this conclusion. The conclusion is supported also by facts of which judicial notice must be taken."

Our reading of the testimony on this issue has led us to a similar decision. The blunders of some witnesses are glaring, as when Assessor Wampler testified that he did not intentionally assess at other than true value in money, though it was shown that he sold a mule for $140 and then assessed the same mule in the hands of his own vendee at $40. But the testimony adduced falls far short of clear, convincing proof that property generally in Missouri was, at the time of the assessment in question here, of greater market value or of value in money to any substantial extent beyond the amount of the assessment thereof.

The appellant has forcefully pointed out that the only ground upon which assessment of other property can be said to approximate true value is that the continued stress of the depression reduced values faster then assessments were reduced. It contends that, if such view be adopted, then it should follow that a similar depression valuation should be put on the company's property. It argues that the depression did bear with full force upon its net income and its sales of securities values in 1932, and it submits at least one table reflecting a value of its property in Missouri only a little over one-third of what its assessments had been. But we think that the proven stability of the plaintiff's organization and property, its history and its future prospects, justified the commission's refusal to base the assessment upon temporary low figures of the bottom of the depression.

In conclusion: A company like the plaintiff has a great stake in the maintenance of government in each of the states where its properties are situated, and must be ready and willing to contribute, through taxation, its fair and just share towards the support of such government. Likewise, in view of the extent and intricacies of the taxable interests of the company, it should make complete, full, and simplified returns to minimize the chance of error on the part of officers charged with the duty of assessing its properties. The failure of the plaintiff to prove the substantial and important allegation of its petition, that it had reported its miles of wires in the state and in the system to the taxing authorities prior to the assessment, has detracted from the equity of the plaintiff's case, notwithstanding its explanation that "the error resulted from the failure of the Commission to require specifically a separate statement of wire in tubes and conduits."

On consideration of all of the testimony we find some basis for the statement made by Mr. Murphy during the course of his examination: "Realizing in these times that everybody is urging a reduction in assessments and had Missouri raised the assessment on this (telegraph) property back in 1928 or 1929 when the net earnings before depreciation and interest amounted to twenty-eight or twenty-nine million dollars a year, to twenty-five or thirty per cent. above the assessment in previous years, then a reduction in assessments might have been in order but in view of the manifest fact that they were under assessed in those years it would be unfair to other companies to not raise or readjust the assessment on this company."

Affirmed.