[No. C000011. Third Dist. May 6, 1987.]

SOUTHERN PACIFIC TRANSPORTATION COMPANY et al.,
Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION et al., Defendants and
Respondents.

940

COUNSEL

Pohle, Johnson & Mitchell, Michael L. Johnson, Arnold I. Weber, William E. Saul and Claude F. Kolm for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Edward P. Hollingshead, Deputy Attorney General, L. B. Elam, County Counsel, Monte L. Fuller, Deputy County Counsel, George Agnost, City Attorney, and John J. Doherty, Deputy City Attorney, for Defendants and Respondents.

OPINION

BLEASE, J.—This is an action by Southern Pacific Transportation Company (Southern Pacific) to obtain a refund of property taxes it paid for the year 1977 predicated upon its claim that the State Board of Equalization (Board) illegally assessed its property. (Rev. & Tax. Code, § 5140.)[1] The Board was granted a summary judgment and Southern Pacific appeals. We will hold that the Board failed to give Southern Pacific fair notice of the method or methods, if any, by which it assessed the value of its property, sufficient to permit Southern Pacific to challenge the assessment in administrative proceedings before the Board. That conclusion compels the reversal of the summary judgment with directions to the trial court to remand the case to the Board for further proceedings.

FACTS AND PROCEEDINGS

On May 24, 1977, the Board assessed the fair market value of the property of Southern Pacific for the year 1977, as unitary property,[2] in the amount of $715 million. The Board sent a notice of the assessment to Southern Pacific setting forth that amount, accompanied by a single page containing appraisal data prepared by the Board staff. The data included six methods of valuing the property, the values derived from their application to the property, and a staff estimate of its unitary value as $600 million.

Southern Pacific filed a petition for reassessment (§ 741), challenging the assessment as arbitrary or as predicated on cost factors which are not valid

_____

[1] All further references to sections are to the Revenue and Taxation Code unless otherwise indicated.

[2] "The essence of the unitary valuation concept is the determination of the value of an enterprise as a whole without regard to the value of the individual assets making up the enterprise." (Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 426.)

criteria of the value for railroad property. The appropriate method of determining the fair market value of the property, it claimed, is the earning capacity of the company. A hearing was held before the Board on June 13, 1977. The Board took official notice of its case files. Southern Pacific introduced no other evidence. It argued that the historical cost and reproduction cost methods are not reliable indicators of the fair market value of railroad property, as recognized by the Board's own rules and publications and past practices. The Board denied the petition.

The Board made findings, incorporating the previously noticed staff data, which stated: "In reaching its full value conclusion, the Board *had before it* the following staff calculated value indicators:

"1. Historical Cost Less Depreciation [historical cost]
$ 814,874,082

"2. Reproduction Cost Less Depreciation [reproduction cost]
$ 2,373,781,524

"3. Capitalized Earning Ability [capitalized earnings]:
"A. Based on net operating revenue for
one year $ 658,765,298
"B. Based on averaged net operating
revenue for five years $ 591,262,216

"4. Stock and Debt Value (calendar year)
$ 505,285,000

"5. Stock and Debt Value (February 28)
$ 499,953,000" (Italics added.)

Southern Pacific paid the disputed taxes and filed a claim for refund with each of the taxing entities. (§ 5096 et. seq.) The claims were rejected and this action followed. The complaint asserts: (1) the assessed amount was arbitrary, without valid support in the record, and not compatible with any calculation by the Board's staff; (2) the cost factors, i.e., historical cost and reproduction cost, should not be given any weight; (3) capitalized income value as calculated by the staff was excessive; and (4) the staff's calculation of the stock and debt value was excessive.

The Board answered and alleged procedural defects in Southern Pacific's challenge before the Board. It was granted a summary judgment on grounds that (1) since the use of cost factors was not shown to be invalid as a matter of law, the assessed amount was not arbitrary, and (2) Southern Pacific's

other claims were barred for failure to raise them in the administrative forum. This appeal from the ensuing judgment followed.

DISCUSSION

I

Introduction

This case involves a dispute about the Board's methods of assessment of the fair market value of Southern Pacific's property. It also involves a question of the notice which was due Southern Pacific in order that it might effectively exercise its statutory right to a hearing to resolve the dispute. These issues are intertwined because there was a multiplicity of potential methods by which the Board might have assessed Southern Pacific's property and Southern Pacific was given no notice of which, if any, of them was applied.

In general, there are three recognized methods (plus their variations) by which to measure the (hypothetical) fair market value of property: comparable sales; the cost of the component assets; and comparable investments yielding the same income. (See, e.g., *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 563-564 [290 P.2d 544]; Cal. Admin. Code, tit. 18, § § 4, 6, and 8.) Given their variations, six separate methods of valuation, plus their combinations, were potentially at issue in this case.

Each of these methods utilizes unique indicia of value. The reliability of each method depends upon distinct considerations. For comparable sales, these considerations include the number, remoteness, and comparability of sales. For the cost of components, some variables are the accuracy of valuation, the liquidity of the assets and the premium attributable to their integration. For comparable investments, the variables include the comparability and accuracy of projected rates of return. The varying nature of property makes it reasonable at times to assess fair market value by selecting one method alone and at other times by combining the methods giving proportionate weights to the disparate indicia of value. (See *De Luz Homes, Inc.*, *supra*, 45 Cal.2d at p. 564.)

Southern Pacific was given no notice of the method or methods used by the Board, if any, among the six possibilities, plus their combinations, suggested to Southern Pacific by the staff analysis which accompanied the notice of assessment. Nonetheless, at the Board hearing following the assessment it tendered challenges to some, though not all, of these methods. It added challenges in the trial court not tendered to the Board.

As to these it was found that Southern Pacific had failed to exhaust its administrative remedies before the Board.[3]

Southern Pacific does properly contend that the Board's assessment is improper on two grounds. First, assuming that the Board utilized the cost of assets, historical cost or reproduction cost methods, it argues that neither method is appropriate because of the nature of the railroad industry. As appears, use of the historical cost method is improper per se and the use of the reproduction cost method is suspect. ■ Second, Southern Pacific claims that the Board failed to meet its statutory obligation to state its method of valuation. (§ 744, subd. (a).) Southern Pacific argues that there is no stated or implicitly obvious method disclosed by the Board's notice or findings which shows why the assessed value straddles the figures derived by the Board's staff. These grounds have merit and compel reversal of the judgment upholding the Board's assessment.

As we will show, the Board's action failed to comply with the requirements of law because, although Southern Pacific was informed of six different methods by which the value of its property *might* be measured, it was not informed if or whether one or more of them was actually used to determine the amount assessed. This failure was compounded by its replication in the findings of the Board. The nature of these errors suggests that the assessment itself was arbitrary because it was not based upon *any* standard of assessment. In any of these cases, the Board's assessment action exceeded the bounds of law. If we presume in favor of the Board that it used (say) the

---

[3]In the context of this case, the exhaustion question resolves into a notice question. Southern Pacific did not fail to exhaust any remedy *available* to it. "It is the general rule that a taxpayer seeking judicial relief from an erroneous assessment must have exhausted his remedies before the administrative body empowered initially to correct the error. [Citations.]" (*Security-First Nat. Bk.* v. *County of L.A.* (1950) 35 Cal.2d 319, 320 [217 P.2d 946]; see also *Focus Cable of Oakland, Inc.* v. *County of Alameda* (1985) 173 Cal.App.3d 519, 527 [219 Cal.Rptr. 95]; *Westinghouse Elec. Corp.* v. *County of Los Angeles* (1974) 42 Cal.App.3d 32, 36-37 [116 Cal.Rptr. 742].) However, that rule, for reasons that are manifest, extends only to the exhaustion of "*available* administrative remedies . . . ." (*Stenocord Corp.* v. *City etc. of San Francisco* (1970) 2 Cal.3d 984, 987 [88 Cal.Rptr. 166, 471 P.2d 966]; italics added.) A remedy ostensibly available is not in fact available where the administrative agency has denied the taxpayer a meaningful opportunity to pursue it. (See *Westinghouse Elec. Corp., supra,* at p. 37 [no need to exhaust remedy "where the assessment is void for failure to follow statutory procedure," relying upon *Gaumer* v. *County of Tehema* (1967) 247 Cal.App.2d 548, 551 (55 Cal.Rptr. 777)]; cf. *Stenocord Corp.* v. *City etc. of San Francisco, supra,* 2 Cal.3d at pp. 987-988; *Star-Kist Foods, Inc.* v. *Quinn* (1960) 54 Cal.2d 507, 509-510 [6 Cal.Rptr. 545, 354 P.2d 1]; *Parr-Richmond Industrial Corp.* v. *Boyd* (1954) 43 Cal.2d 157, 165 [272 P.2d 16].) If there is an administrative remedy, it must be utilized. It is readily apparent that if there is more than one method of valuation which may have been applied, in the absence of notice which identifies the method actually used, the taxpayer may be unable to determine what must be challenged. If that is the case the taxpayer need not guess at its peril. If no method was applied, there is, of course, nothing to be challenged. It is the administrative remedy actually made available that must be exhausted, not the taxpayer.

two methods giving values between which the assessed value was located, the assessment is illegal because the Board's use of the (upper and closest) historical cost method is outlawed by the Board's own regulations.

As a predicate to the detailed exposition of these conclusions, we examine the methods of valuation which the Board may apply and the procedures for review which must be afforded the taxpayer.

## II

### The Standard of Valuation

The California Constitution mandates that the Board annually assess property owned or used by railroad companies. (Cal. Const., art. XIII, § 19.)[4] Such property is subject to taxation to "the same extent and in the same manner as other property." (*Ibid.*) It must be assessed at its "fair market value or full value." (§ 722; see also fn. 4, *ante.*) Fair market value "means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110.)[5]

The measurement of fair market value may be a difficult and elusive undertaking. Nonetheless, "no property may escape taxation because of the difficulty of determining its full cash value." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) Different kinds of property may require differing methods of measurement of fair market value. That is particularly true when, as in the case of public utilities, market data are lacking. (See Bertane, *The Assessment of Public Utility Property in California, supra,* 20 UCLA L.Rev. at

---

[4]Article XIII, section 19 of the California Constitution provides in pertinent part: "The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity. This property shall be subject to taxation to the same extent and in the same manner as other property."

[5]The California Administrative Code, title 18, section 2 further provides: "In addition to the meaning ascribed to them in the Revenue and Taxation Code, the words 'full value,' 'full cash value,' 'cash value,' 'actual value,' and 'fair market value,' mean the price at which a property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would transfer for cash or its equivalent under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other."

pp. 425-426.) In 1967 the Board adopted regulations setting forth recognized methods of valuation by which to cope with these problems. (Gov. Code, § 15606; Cal. Admin. Code, tit. 18, § 3.) They provide that the Board shall consider "one or more of the following, as may be appropriate for the property being appraised": (1) the comparative sales approach;[6] (2) the stock and debt approach;[7] (3) the replacement or reproduction cost approach;[8] (4) the historical cost approach;[9] and (5) the income (or capitalized earnings) approach.[10] Because no one of these methods necessarily supplies the best measure of the fair market value of the property to be assessed, "the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them." (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 564; see also *ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 252 [162 Cal.Rptr. 186]; Cal. Admin. Code, tit. 18, § 3.) Nonetheless, "[i]n valuing property, the assessor must adhere to the statutory standard of 'full cash value' . . . ." (*De Luz Homes, Inc., supra,* at p. 566 and following.) As the cases and regulations reveal, that requires the application of accepted and accessible methods for its measurement. ■ Lacking an ascertainable standard of valuation,

---

[6]The comparative sales approach employs the compilation of sales prices of comparable properties. (Cal. Admin. Code, tit. 18, § 3, subd. (a).)

[7]The stock and debt approach employs consideration of "[t]he prices at which fractional interests in the property or comparable properties have recently sold, and the extent to which such prices would have been increased had there been no prior claims on the assets . . . ." (Cal. Admin. Code, tit. 18, § 3, subd. (b).)

[8]The replacement or reproduction cost approach measures the "cost of replacing reproducible property with new property of similar utility, or of reproducing the property at its present site and at present price levels, less the extent to which the value has been reduced by depreciation, including both physical deterioration and obsolescence . . . ." (Cal. Admin. Code, tit. 18, § 3, subd. (c).)

[9]The historical cost method may be used only if "income from the property is regulated by law and the regulatory agency uses historical cost or historical cost less depreciation as a rate base . . . ." This method involves a consideration of the "amount invested in the property or the amount invested less depreciation computed by the method employed by the regulatory agency . . . ." (Cal. Admin. Code, tit. 18, § 3, subd. (d).)

[10]The income approach (or capitalized earnings approach) involves a determination of the "amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt . . . ." (Cal. Admin. Code, tit. 18, § 3, subd. (e).)

The regulations express a preference for this approach, if cost approaches are unreliable. California Administrative Code, title 18, section 8, subdivision (a) provides: "The income approach to value is used in conjunction with other approaches when the property under appraisal is typically purchased in anticipation of a money income and either has an established income stream or can be attributed a real or hypothetical income stream by comparison with other properties. It is the preferred approach for the appraisal of land when reliable sales data for comparable properties are not available. It is the preferred approach for the appraisal of improved real properties and personal properties when reliable sales data are not available and the cost approaches are unreliable because the reproducible property has suffered considerable physical depreciation, functional obsolescence or economic obsolescence, is a substantial over- or underimprovement, is misplaced, or is subject to legal restrictions on income that are unrelated to cost."

an assessment is, perforce, arbitrary. Whether that is the case is a question of law. "[W]hether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law" is a question of law. (*Bret Harte Inn, Inc., supra,* 16 Cal.3d at p. 23.)

### III

### The Administrative Means for Challenging an Assessment

The assessment hearing procedure is initiated by a notice from the Board to the taxpayer "stating the amount of the assessed value of the assessee's unitary property." (§ 731.) This notice must advise the taxpayer by what date and of the place where a petition for reassessment of the property must be filed. The taxpayer may then petition the Board in writing for a reassessment of the property, stating "the specific grounds upon which it is claimed a correction or adjustment of the assessment is founded." (§ 741.) Upon a timely petition, the Board must "set a time and place within the state for hearing on the petition" (§ 742), which "shall not be less than 10 days from the date of the mailing of the notice . . . ." (§ 746.) The hearing must be open to the public, except that, after taking evidence, the Board may deliberate in private with the staff (§ 743). Upon written request the Board shall make a full record of the hearing. (§ 743.)

Nothing more is said about the procedure by which the issues to be decided by the Board are to be framed and determined.[11]  ▮  There is no explicit statutory requirement that the Board inform the taxpayer of its method of assessment prior to the reassessment hearing. However, following the hearing, the Board must notify the petitioner of its decision, and, if a prior

---

[11]At the time of the hearing on Southern Pacific's petition for reassessment, the Board had not adopted rules governing the hearing procedures before it. Consequently, there was no rule or regulation governing the hearing or its evidentiary aspects other than those set forth in the statutes. Subsequent to the time period applicable to this case, the Board promulgated rules governing its hearing procedures. (See Cal. Admin. Code, tit. 18, § 907 et seq.)

The rules currently provide that a "petition shall be set for oral hearing if [properly] requested . . . . An oral hearing may consist of any unsworn presentation by the petitioner or a formal evidentiary hearing." (Cal. Admin. Code, tit. 18, § 908.) The scope of the hearing is limited to the precise elements set forth in the petition, except the Board may inquire into relevant new matters if the parties are afforded an opportunity to respond (Cal. Admin. Code, tit. 18, § 909). The hearing will proceed in a particular manner (Cal. Admin. Code, tit. 18, § 911). No reduction of an assessment following an oral hearing shall be made unless the petitioner attends the hearing and answers questions upon oath or affirmation if requested by the Board (Cal. Admin. Code, tit. 18, § 912). If a formal evidentiary hearing is chosen, the admission of and consideration of evidence is governed by California Administrative Code, title 18, section 913. (See also Cal. Admin. Code, tit. 18, §§ 914-916.) As can be seen, these rules do not redress the defects in notice assayed in this opinion. However, as to new matters raised by the Board at the hearing, there is an opportunity provided to respond which carries with it implicit recognition that notice of the method of assessment should be given.

request has been made, must "make written findings and conclusions . . . ." (§ 744, subd. (a).) At this juncture the statute requires that the Board specify the methods of assessment it applied and the facts it found to be material in applying such methods. Section 744, subdivision (a), directs that the "findings shall fairly disclose the board's determination of material factual issues and shall contain a statement of the method or methods of valuation used by the board in valuing the property."

IV

The Defects in the Board's Notice and Findings

A.

As seen, the Board, in its notice to the taxpayer of the amount assessed, is not explicitly required by statute to inform the taxpayer of the method of valuation by which it determined the amount. Nonetheless, the taxpaper is entitled to a full evidentiary "hearing" at which it may present its claims that the assessment is in need of "correction or adjustment." (§§ 741-742.) That hearing is limited to "the specific grounds upon which [the taxpayer has] claimed a correction or adjustment of the assessment is founded." (§ 741.) Following that hearing, the Board is required to make findings that fully disclose the method or methods of valuation which it actually used and the facts relating to the assessed property which are material to the value which it determined by application of these methods.

This statutory scheme is (obviously) meant to be carried out. That cannot rationally happen if the taxpaper is required to challenge a method of assessment which the Board has secretly applied and which reasonably cannot be ascertained by the taxpayer. To have a meaningful hearing to correct or adjust an assessment entails the right to know the method that has been employed in its production. To be heard in such a matter the taxpayer must speak to what is incorrect or maladjusted about the assessment. The taxpayer cannot speak to what has been done incorrectly if it does not know what was done. Accordingly, to deny the taxpayer notice of the methods of assessment employed is to deny the taxpayer the hearing which the statute contemplates.

"Yet [as was said in an earlier case] it is [impliedly] contended that the board has the right to keep to itself these weighty conclusions which the statute requires it to reach, on the correct determination of which depends the question whether the board has exceeded its jurisdiction or exhausted its full power, which it could keep only as long as its members remembered them, and, in view of the extent of its work, not very long, if for any length of time, and make no entry thereof on its record or give any notice in regard

thereto, and that all that was required was that it should enter of record and give notice of the automatic result of its work. The mere statement of this position is sufficient to condemn it. It is inconceivable that the Legislature had any such idea. Had it had any such idea, it would never have provided for a preliminary assessment and notice thereof, to the company, so that it might appear before it and point out any errors that the board might have fallen into in the operation of a complicated piece of machinery. It would have contented itself with a provision fixing the time and place for making the assessment at which the companies might appear and introduce such evidence and present such arguments as they saw fit without more." (*Louisville & N. R. Co.* v. *Bosworth* (D.C. Ky. 1913) 209 Fed. 380, 444-445.)

The general principle employed in *Bosworth* is widely recognized. ■■ "The requirement of giving notice will be inferred from legislation granting powers to conduct hearings, especially where notice is necessary to sustain the constitutionality of the law." (2A Sutherland, Statutory Construction (4th ed. 1984) § 55.04, p. 605; fn. omitted.) That has long been the California law. (*Taylor* v. *Hill* (1896) 115 Cal. 143, 145 [46 P. 922] [notice supplied]; *Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214] (approving of this court's decision in *Currieri* v. *City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [84 Cal.Rptr. 615] ["city charter provisions imply rights to notice and hearing"]); see also *State of Calif.* v. *Poulterer* (1860) 16 Cal. 514, 531 [remedy supplied].) The notice thus supplied is in law a part of the *statute*. "[W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed." (*Johnston* v. *Baker* (1914) 167 Cal. 260, 264 [139 P. 86].)

■■ Applying these principles, we hold that the right to notice of the Board's method of assessment is necessarily to be implied from the hearing rights granted by statute. We do so in consideration of the prospect that such an implication may be essential to the constitutionality of the act. ■■ ■■ (See *Taylor* v. *Hill, supra,* 115 Cal. at p. 145)[12]

---

[12]Earlier case law is replete with assertions that in the field of taxation the right to notice is of a peculiarly limited scope. (See, e.g. *Louisville & N. R. Co.* v. *Bosworth, supra,* 209 Fed. at p. 439; see *Chesney* v. *Gresham* (1976) 64 Cal.App.3d 120, 128-130 [134 Cal.Rptr. 238].) That position has been undercut by *Mennonite Board of Missions* v. *Adams* (1983) 462 U.S. 791 [77 L.Ed.2d 180, 103 S.Ct. 2706]. (See also *Banas* v. *Transamerica Title Ins. Co.* (1982) 133 Cal.App.3d 845, 850-852 [184 Cal.Rptr. 262].) In *Mennonite* the United States Supreme Court applied *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 872, 70 S.Ct. 652], without reservation, to the field of taxation. *Mullane* says that, although "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause [of the Fourteenth Amendment] [ ] there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." (*Mullane, supra,* 339 U.S. at p. 313 [94 L.Ed.at pp. 872-873].) *Mullane* holds that a state must provide "notice reasonably

■ The required notice was not given in this case. The notice of assessment was supplemented by an attachment which provided Southern Pacific with an abstract of a fiscal analysis of its property, prepared by the Board staff.[13] The abstract sets forth six methods of assessment of the property, the values which the staff derived by application of each of the methods (ranging from $500 million to $2.73 billion), the amount recommended by the staff

---

calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Id.,* at p. 314 [94 L.Ed. at p. 873].) "The means employed must be such as one desirous of actually informing [party to be noticed] might reasonably adopt to accomplish it." (*Id.,* at p. 315 [94 L.Ed. at p. 874].)

That principle requires that the *content* of the notice sufficiently inform the party entitled to a hearing of that which it must know so that the right may be effectively exercised. (Cf. *Philbrick* v. *Huff* (1976) 60 Cal.App.3d 633, 641, 649 [131 Cal.Rptr. 733].) In this sense the process that is due is that which will "minimize 'substantially unfair or mistaken deprivations' of the entitlements conferred by law upon private individuals or groups. It ensures that a challenged action accurately reflects the substantive rules applicable to such action; its point is less to assure *participation* than to use participation to assure *accuracy.*" (Tribe, American Constitutional Law (1978) § 10-7, p. 503, fns. omitted, original italics.) The constitutional value at stake is the integrity of the administrative process; its fidelity to the rule of law.

That transcendent value is threatened here. Southern Pacific, as a taxpayer, is entitled to the fair application of the substantive law of fair market value. The hearing procedure is a means to that end. The defect in notice here assayed necessarily impairs the determination whether the substantive law has been applied. It is no accident, we think, that the question—was Southern Pacific given notice of the method of valuation used by the Board?—merges with the question—did the Board use any method at all?

[13]The staff analysis provides, in summary part:

| "I. Value Indicators As of March 1 | 1976 | 1977 |
|---|---|---|
| "A. Historical Cost Less Deprec. | 819,316,734 | 814,874,082 |
| "B. Reproduction Cost Less Deprec. | 1,763,319,848 | 2,373,781,524 |
| "C. Capitalized Earnings Ability based on | | |
|   1. net operating revenue for 1 year before depreciation, etc. | 384,101,000 | 658,765,298 |
|   2. avg. net operating revenue for 5 years | 507,850,000 | 591,262,216 |
| "D. Stock & Debt Value based on | | |
|   1. calendar year mon hi & lo | 506,340,000 | 505,285,000 |
|   2. February 28, common stock prices | | 499,953,000 |

"II. *History*

| Cal Yr | Cal. Plant Adds. | Retires | Reported Net Op Revenue | Lien Date | Basic Cap Rate | Board Value |
|---|---|---|---|---|---|---|
| 1972 | 49,474,000 | 8,605,000 | 125,599,895 | 1973 | 9.0 | 550,000,000 |
| 1973 | 41,701,000 | 11,805,000 | 116,271,996 | 1974 | 9.87 | 590,000,000 |
| 1974 | 40,222,000 | 4,804,000 | 91,272,393 | 1975 | 10.5 | 580,000,000 |
| 1975 | 22,663,000 | 10,739,000 | 51,861,010 | 1976 | 11.5 | 507,000,000 |
| 1976 | 20,452,000 | 9,884,000 | 89,665,682 | 1977 | 12.0 | |

| "III. Value Estimates For 1977 | *Staff* | *Board Adopted Value* |
|---|---|---|
| | 600,000,000 | 715,000,000 |

"IV. Correlation & Remarks: Interstate allocation factor 37.97 percent. Southern Pacific's revenues recovered from 1975's recession level early in 1976 but the rate of recovery was not sustained throughout the year. This appears to coincide with the gradual improvement of the national economy. More car loadings, heavier loadings per car and freight rate increases contributed to the growth in revenues. The earnings are extremely volatile which suggests reliance on a 5 year average."

as the assessed value ($600 million) and the Board's assessed value ($715 million). Although the value recommended by the staff does implicitly rely upon an ascertainable method of valuation,[14] the Board did not adopt that value. Rather it selected a value which does not come close to, let alone match, any of the values contained in the staff analysis. The assessed amount. $715 million, is more than halfway between the highest of the capitalized earnings figures ($658 million) and the historical cost figure ($814 million). Nothing whatever is said about the means by which the $715 million figure was determined.

The Board claims, referring to the findings, that "[i]t is evident that the Board considered all of the value indicators but gave more weight to the capitalized earnings ability than to the other value indicators." That conclusion is not evident from this record. In fact, the assessed value is closest to the historical cost figure, a figure which we later show cannot be validly applied. Nor is the conclusion, implicit in the Board's argument, self-evident that the value of the property was based upon (though higher than) the capitalized earnings method. Finally, Southern Pacific was not given a rationale for the interpolation between the historical cost and replacement cost indicators and the capitalized earning indicators, if that in fact was done.

Lastly, Southern Pacific would not have received so much as a photon of illumination of the Board's valuation methods had it timely been informed of the content of the Board's discussion at the meeting at which it initially determined the assessed value. The record of that meeting shows, if anything, that the value was arrived at in the manner of an auction.[15] (Cf. *Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353 [153 P.2d 746].)

---

[14]The palpable implication to be drawn from the staff "remarks" is that the method it used is capitalized earnings. The straddle of the two capitalized earnings figures is adequately explained by the remarks concerning the greater reliance placed on the five-year average method.

[15]The transcript of the May 24, 1977, meeting, at which the Board determined the assessed amount, contains this exchange:

"CHAIRMAN BENNETT: Number 872, Southern Pacific Transportation Company. I have a figure of $750 million.

"MR. CORY: Seven twenty.

"MR. REILLY: That's Southern Pacific?

"CHAIRMAN BENNETT: Yes.

"MR. REILLY: Six hundred million, the staff's figure.

"MR. NEVINS: 546 million.

"IRIS SANKEY: 650 million.

"CHAIRMAN BENNETT: I have to observe on this, if my memory is correct, that Southern Pacific stated, whether they meant it or not, that the asking or selling price for the commute properties in the San Francisco Peninsula were around 700 million dollars for that segment of the system, which is a small portion of the total.

"MR. CORY: That's what they asked for?

"CHAIRMAN BENNETT: I don't think they would.

As a caveat we note two practical considerations that limit the impact of the principle applied in this case. First, in most cases the taxpayer has adequate circumstantial notice of the assessor's methodology to mount a challenge, e.g., from the nature of the assessment or from information readily available to it. Second, notice of the method need only indicate the outline and rationale(s) for the preliminary assessment, sufficient to permit a challenge to the method and its application. (Cf. fn. 14, *ante.*) In this case, however, the Board's methods, if any, are the central focus of the taxpayer's challenge, are thoroughly opaque, and were so throughout the administrative process.

## B.

■■■ The defects in the notice of assessment, which are violations of an implicit statutory right to notice, are replicated in the Board's findings as violations of an explicit statutory right to findings.

Section 744, subdivision (a), requires that the "findings shall fairly disclose the board's determination of material factual issues and shall contain a statement of the method or methods of valuation used by the board in valuing the property." The Board failed to do so. Rather, it affirmed the assessed amount of $715 million and informed Southern Pacific that, in reaching its decision, it "*had before it*" the same staff calculated indicators of value as those provided Southern Pacific with the notice of assessment. Nothing more is offered to support its assessment. The sins of the notice are thus visited upon the findings.

---

"MR. CORY: That's their negotiating position? It's their mouths.
"CHAIRMAN BENNETT: This is management. We're valuing the whole thing. I'll move—
"MR. CORY: You're at what?
"IRIS SANKEY: Six fifty.
"CHAIRMAN BENNETT: I'll move 740 million.
"MR. REILLY: That's on Southern Pacific?
"CHAIRMAN BENNETT: Yes.
"MR. CORY: Why don't we try 715 and see if we can pick up the third vote?
"CHAIRMAN BENNETT: Do you so move? Let's try 730 million.
"IRIS SANKEY: I move Ken's figure.
"CHAIRMAN BENNETT: Your motion is 715?
"MR. CORY: That's a little more than they are asking for the commuter line.
"CHAIRMAN BENNETT: Is there a second on that?
"MR. REILLY: What's the staff's figure?
"CHAIRMAN BENNETT: Is there a second to that? Do you second it?
"MR. CORY: Yes.
"CHAIRMAN BENNETT: Call the roll, Mr. Bell.
"(Vote: Ayes: Cory, Bennett, Sankey
          Noes: Reilly, Nevins.)"

At the reassessment hearing, Southern Pacific claimed, as here, that there is no reasonable basis for the selection of a figure that is higher than those figures derived from an application of the capitalized earnings method or the stock and debt method. It challenged the applicability of the historical cost method because it violates a rule of the Board. It also challenged the applicability of the replacement cost method under another regulation of the Board and because of the nature of railroad property. The Board did not address these challenges nor did it explicitly state whether it had in fact relied on such value indicators. The Board impliedly rejected Southern Pacific's suggestion that market value be derived by the equal weighting of the capitalized earnings and stock and debt value indicators. But it did not give any explanation why it concluded, if that is what it did, that the market value was between the staff calculated figures for capitalized earnings and historical cost.[16]

These findings fail to comply with the statutory mandate that "the findings shall fairly disclose the board's determination of material factual issues and shall contain a statement of the method or methods of valuation used by the board in valuing the property." (§ 744, subd. (a).) A findings requirement "serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.]" (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 516 [113 Cal.Rptr. 836, 522 P.2d 12]; fn. omitted.)

■ Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. (See Deering, Cal. Administrative Mandamus (Cont.Ed.Bar 1966) §§ 5.46 - 5.48, pp. 62-63.) However, findings by implication cannot be substituted for specific findings when they are required by law. (*Kirby* v. *Alcoholic Bev. etc. App. Bd.* (1969) 3 Cal.App.3d 209, 218 [83 Cal.Rptr. 89].) ■ Section 744, subdivision (a), explicitly requires that the findings contain a statement of the method or methods of valuation actually used. The Board's findings do not do so. They merely inform Southern Pacific of the various figures the Board "had before it." That does not reveal whether the Board relied on all the staff-calculated indicators of value, relied on some of them, or, in fact, relied on none of them. Nor do the findings reveal

---

[16]Conceivably, the Board could have completely rejected the historical cost and reproduction cost figures as reliable indicators of value. It may have considered the capitalized earning indicator as calculated by the staff to be understated, for some reason it did not reveal, and thus increased the capitalized earnings figure to account for the understatement. But that is speculation; and speculation does afford a basis for review.

whether the Board inferred from the cost figures that the earnings figures were understated. Its approach is as unsatisfactory as a cooking recipe which contains no more than a list of the potential ingredients and a photograph of the finished dish.

V

The Validity of the Historical and Reproduction Cost Methods

A.

It is conceivable that the Board did not rely on the challenged cost indicators of value in estimating the value of Southern Pacific's property. If there was no reliance on such indicators, Southern Pacific's challenge to them is immaterial. However, because of the possibility that the Board relied upon the challenged cost indicators, it is appropriate to discuss the issues pertinent to Southern Pacific's challenge at this time.

The Board acknowledges that if a challenge is made to the validity of a method of valuation, the issue is a question of law for the courts. (See *Bret Harte Inn, Inc., supra,* 16 Cal.3d at p. 23.) Nonetheless, it relies on *ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d 246, for the proposition that cost methods are not inherently unreliable. That proposition, so it implies, concludes the legal inquiry and transforms the challenge into a question of substantial evidence. We do not so read the *ITT* case.

In *ITT,* the court rejected the taxpayer's claim that in all cases, reproduction cost is a ceiling on value. The Board's assessed value of ITT World Communication's property roughly approximated the amount of the property's capitalized earnings ability; an amount that was greater than the reproduction cost figure. (*Id.,* at pp. 250-251.) The court held that, while it is often appropriate to view reproduction cost as a ceiling on value, that is not always appropriate. (*Id.,* at p. 256.) Since the taxpayer in *ITT* failed to adduce evidence that its particular circumstances were such that replacement cost should be used as a ceiling the court held that its claim failed. (*Id.,* at pp. 256-257.)

The Board reasons from *ITT* that, because cost indicators of value are not *inherently* invalid, any challenge to their application is in reality a claim that the Board erroneously applied a valid method of valuation. And because a question of application is frequently a question of fact (see *Bret Harte Inn, Inc., supra,* 16 Cal.3d at p. 23), the argument continues, the scope of review is limited to the determination whether there is substantial evidence to

support the application. Thus, Southern Pacific's failure to present evidence at the hearing on the petition to support their claim of erroneous application precludes judicial relief.

We reject the suggestion that any challenge to the method of a valuation that does not contest the reliability of the method in *all* instances tenders a question of fact. The fact/law distinction is not so easily drawn. Whether a rule may be *applied* to *given* circumstances (i.e., where the facts are not as such in dispute) tenders a question of meaning and hence of law. Whether the rule was so applied or whether the circumstances occurred are questions of fact. A rule and its (permissible) applications are definitionally, not empirically, related. The claimed application functions definitionally, as a paradigm or exemplar of a meaning of the rule. (See *People* v. *Kimbrel* (1981) 120 Cal.App.3d 869, 874-875, and 875, fn. 6 [174 Cal.Rptr. 816].) The determination whether the question of the application of a rule tenders a question of its meaning or a question of fact turns on the nature of the challenge made.

Southern Pacific does not claim that the Board made errors in calculating the reproduction cost and historical cost figures. It does not dispute the Board's estimation of the cost of replacing a specific piece of property. Its challenge is not to the *result* reached when applying these methods. Nor does Southern Pacific claim that disputed characteristics peculiar to *its* property make reproduction cost and historical cost improper measures of value. The issue of disputed events in such cases tenders questions of fact. Rather, Southern Pacific's claim is that, because of characteristics of the *railroad industry* which are *not* in dispute, historical cost and reproduction cost are not reliable indicators of value for railroad property. Thus, the issue tendered is whether these cost methods are proper *measures* of the fair market value of railroad property because they are not "appropriate for the [kind of] property being appraised." (Cal. Admin. Code, tit. 18, § 3.) This is plainly a legal question, ultimately for the courts to resolve. (See *Bret Harte Inn, Inc., supra,* 16 Cal.3d at p. 23; *Jones* v. *County of Los Angeles* (1981) 114 Cal.App.3d 999, 1004-1005 [170 Cal.Rptr. 879]; cf. *ITT World Communications, Inc., supra,* 101 Cal.App.3d at pp. 256-257.)[17]

---

[17]In its complaint, Southern Pacific raised additional issues not tendered at the hearing. Southern Pacific challenges the result reached by the Board's staff when applying the capitalized earnings approach and the stock and debt approach. The claim is that, although these are proper methods of valuation, the Board's calculations were erroneous. This is the type of issue that can only be resolved after a consideration of the particular facts concerning the taxpayer's property. These are in the nature of adjudicative facts. (See 3 Davis, Administrative Law Treatise (1980) § 15.2, pp. 138-142.) Southern Pacific's failure to tender these issues below precludes them from raising them here. (Cf. fn. 3, *ante.*)

Southern Pacific did challenge at the hearing the alleged consideration by the Board of hearsay statements that Southern Pacific had placed a $700 million selling price on some of its commuter property. The Board did not reveal in its findings whether or not it had relied on such figure when establishing the $715 million full market value. If it did so, it improperly acted beyond the record. However, the materiality of this issue can only be ascertained after the Board has revealed the method or methods it has applied.

█ If a legal issue is presented "judicial inquiry is pursued independent of and apart from the decision of the Board and unrestricted by any consideration of the scope of review. [Citations.]" (*Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327]; see also Ehrman & Flavin, Taxing Cal. Property (2d ed. 1979) § 30.10, p. 699.) Accordingly, in this case there is no genuinely disputed *adjudicative* fact.[18] The scope of our review of the appropriateness of the application of historical cost and reproduction cost to railroad property is not confined by the substantial evidence test.

## B.

That leaves the legal issues, whether historical cost and reproduction cost lawfully can be considered in the valuation of railroad property. █ Southern Pacific contends that the Board's own regulations proscribe the use of historical cost for railroad property. On that point we agree.

California Administrative Code, title 18, section 3, subdivision (d), provides that the Board may consider historical cost "[i]f the income from the property is regulated by law and the regulatory agency uses historical cost or historical cost less depreciation as a rate base . . . ." Southern Pacific asserts that, although railroads are regulated by the Interstate Commerce Commission, it does not use historical cost as a rate base. Counsel for the Board advised the court at oral argument that it did not dispute these claims. The Board thereby has conceded that the conditions precedent to its use of historical cost have not been met and accordingly it is a violation of their regulation to use that method of valuation. The Board is, of course, bound by its own valid regulations. (See *United States* v. *Nixon* (1974) 418 U.S. 683, 694-696 [41 L.Ed.2d 1039, 1056-1057, 94 S.Ct. 3090]; cf. *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 680 [170 Cal.Rptr. 484, 620 P.2d 1032].) Since, under the view most favorable to the Board its assessment rests on use of an illegal method, Southern Pacific's challenge to the assessment must be upheld on this ground.

## C.

The impropriety of considering reproduction cost is not so obvious.[19] The

---

[18]The only fact disputes with which we presented are legislative facts, i.e., "facts which help the tribunal determine the *content of law* and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take." (2 Davis, Administrative Law Treatise (1958) § 15.03, p. 353.) Adjudicative facts, on the other hand, are "facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent . . . ." (*Ibid.*)

[19]The relevancy of replacement cost for purposes of assessment of the value of railroad property is a matter of legal controversy. (See 71 Am.Jur.2d, State and Local Taxation, § 411; also

regulation defining reproduction cost does not contain any flat conditions for its application. However, it does say that the income method of valuation is "preferred [,] when reliable sales data are not available and the cost approaches are unreliable because the reproducible property has suffered considerable physical depreciation, functional obsolescence or economic obsolescence, is a substantial over- or underimprovement, is misplaced, or is subject to legal restrictions on income that are unrelated to cost." (Cal. Admin. Code, tit. 18, § 8, subd. (a).) The implication of this provision is that cost methods, e.g., replacement cost, may well be inapplicable to the valuation of railroad property.

Southern Pacific made precisely this challenge to the method. As related, we cannot discern how the Board resolved this objection to the immateriality of the method. Since the matter must be returned to the Board on other grounds, we eschew resolution of the objection. If the Board chooses to rely upon the replacement cost figure, its findings should disclose its determination of the material preliminary fact issues embedded in Southern Pacific's objection. (§ 744; cf. Evid. Code, §§ 400-403.) In view of the implications in the Board's regulations, that if certain conditions exist, cost methods are generally unreliable, meaningful judicial review may be accomplished only if the Board's findings indicate whether the conditions exist and, if so, why it is that it is nonetheless appropriate to rely upon the replacement cost method in these circumstances. If the Board would have us defer to the Board's expertise on this point, it must show us the reasoning by which its expertise is employed.

Absent any statement of the Board's rationale, we have no expertise to defer to. The legislative facts necessary to a determination of this issue have not been revealed. (See fn. 18, *supra;* 3 Davis, Administrative Law Treatise (1980) § 15.2, pp. 138-142.)

Upon the reinitiation of the assessment proceedings, the parties may amplify such evidentiary points as they deem appropriate in the light of this opinion. In the event the Board's notice to Southern Pacific of the grounds of its assessment reveal that no reliance is placed on the reproduction cost figure, such an inquiry may be unnecessary.[20]

---

cf., e.g., *Harris Trust & Savings Bank* v. *Earl* (8th Cir. 1928) 26 F.2d 617; *Western Union Telegraph Co.* v. *Wilcox* (8th Cir. 1936) 85 F.2d 352, 360.) Relevancy may be bottomed upon a claim of mismanagement of assets leading to understatement of value if reliance is placed on capitalized earnings figures. (See *Northern Pac. Ry. Co.* v. *Adams County* (E.D. Wash. 1932) 1 F.Supp. 163, 173-176.) It has been suggested that to the degree replacement cost diverges from other valuation methods it loses weight as a factor in valuation. (See *id.,* at p. 186.) Here, the divergence is extreme.

[20]We find no merit to Southern Pacific's claim that the fact the Board reviews its own valuations of state-assessed properties at the hearing on the petition for reassessment is a violation of due process. The constitution provides for the assessment of such property by the Board. (Cal. Const., art. XIII, § 19.) We fail to see how the provision of an additional statutory procedure by which a taxpayer may petition for a reconsideration of such assessment prior to court review violates the requirements of due process of law.

## DISPOSITION

The administrative procedure was flawed at the outset. Accordingly, that is the point to which the parties must be returned. The judgment is reversed. The superior court shall remand the case to the Board with directions that it shall either reissue the notice of assessed valuation, if it maintains that the figure is correct, or reassess the Southern Pacific property for the year 1977, and that, in either event, it shall provide notice to Southern Pacific disclosing the method or methods of valuation used in determining the assessment, and if more than one method is utilized, the criteria for weighting the methods in arriving at the assessed value in accordance with the discussion in this opinion.

The Board shall, upon proper request, afford Southern Pacific a hearing at which it may contest the assessment thus noticed. Following such a hearing the Board shall follow the requirements of section 744, subdivision (a) and, to that end, shall set forth the methods of valuation applied and if more than one method is applied shall set forth the criteria by which the assessment figure was arrived by such compound methods. It further shall set forth the facts deemed to be material by virtue of the application of these methods and criteria to the Southern Pacific property.

Puglia, P. J., and Sparks, J., concurred.

A petition for a rehearing was denied June 2, 1987.